# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GPM SOUTHEAST LLC,

                    Plaintiff,

v.

RIISER FUELS LLC,

                    Defendant.

Case No. 21-CV-554-JPS

**ORDER**

       In September 2019, Defendant Riiser Fuels LLC ("Riiser") entered into an agreement to sell sixty-four service stations and convenience stores in Wisconsin to Plaintiff GPM Southeast LLC ("GPM"). The parties closed the sale after much negotiation, settling on a purchase price that integrated a post-closing price adjustment provision. Under this provision, if the earnings of the sixty-four locations in the year 2020 did not meet a specified threshold, Riiser would be obligated to repay GPM in cash or stock shares, in an amount to be determined based on the locations' actual earnings, but in no event greater than $3.375 million.

       As it so happened, 2020 was a lackluster year in many respects, including for the service station and convenience store industry. After officials from GPM and Riiser debated the locations' earnings, GPM served a demand letter on Riiser stating that, under the parties' contract, Riiser was obliged to pay back the post-closing adjustment of $3.375 million to GPM. When Riiser did not pay, GPM initiated this litigation in late April 2021. ECF No. 1.

       After the Court winnowed away several claims and defendants on Riiser's motion to dismiss, ECF No. 23, Riiser answered and asserted

affirmative defenses, ECF No. 24, and the litigation proceeded. The parties later filed cross-motions for summary judgment. ECF Nos. 36 and 38. Those motions are fully briefed. ECF Nos. 37, 47,[1] 49, 51, 52, 54. For the reasons detailed in this Order, GPM's motion will be granted in part and denied in part, Riiser's motion will be denied in part and granted in part.

## 1.      SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs 'that [the court] leave[s] those tasks to factfinders.'" *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1010 (E.D. Wis. 2018) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "[T]he non-movant need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence

---

[1] Riiser originally filed its memorandum of law at ECF No. 39, but later filed a "corrected" brief in support of its motion for summary judgment at ECF No. 47. The Court will disregard the original brief and consider only Riiser's "corrected" brief.

Case 2:21-cv-00554-JPS   Filed 12/20/22   Page 2 of 56   Document 60

demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 2. RELEVANT FACTS

The parties have submitted a joint statement of material facts, ECF No. 34, and statements of their disputes thereto, ECF Nos. 40 and 50, as required by the Court's trial scheduling order. The Court adopts the relevant[2] and undisputed facts as set forth in the parties' joint statement of facts, with internal citations omitted for brevity. The Court provides additional information for the sake of clarity where needed and notes where record evidence outside the joint statement of facts is cited.

### 2.1 The Asset Purchase Agreement

GPM and Riiser entered into an Asset Purchase Agreement on September 27, 2019 (the "APA"). The APA involved a transaction between GPM (as the purchaser) and Riiser (as the seller) related to the sale of sixty-four retail fuel businesses and convenience stores that Riiser owned and operated in Wisconsin.

In preparation to execute the APA, the parties exchanged business and financial information related to the operations of the locations, including spreadsheets detailing Riiser's profits and losses for the sixty-four locations and GPM's formula for calculating profit and loss.

As consideration for the purchase of the sixty-four retail fuel businesses and convenience stores, Riiser received cash and other items of value including, but not limited to, "Base Consideration" of $6,352,500 in

---

[2]As explained in Section 3 *infra*, many of the parties' proffered facts—for example, the content of emails back and forth between GPM and Riiser representatives—are irrelevant to the issues presented on summary judgment. Accordingly, the Court omits this information from the facts section.

cash plus additional payments for the inventory and cash reserves in the stores at the time of the closing (the "Closing Purchase Price"), and $14,647,500 in cash and MLP Units[3] pursuant to a jointly executed Contribution Agreement attached to the APA.

GPM has noted, and Riiser has not disputed, that the APA "and all matters arising out of the transaction contemplated hereby or related thereto shall be governed, construed, and interpreted in all respects according to the Laws of the State of Wisconsin, without reference to principles of conflicts of law thereof." ECF No. 37 at 7, n.3 (quoting APA § 14.5).

## 2.2 Section 2.3 of the APA: the Post-Closing Adjustment Provision

In negotiating the APA, representatives of GPM and Riiser differed on the projected store-level EBITDA—earnings before interest, taxes, depreciation, and amortization—for 2020, which was to be used in formulating the Closing Purchase Price. As a result, the parties agreed to include a reverse earnout provision in the APA that would allow them to come to an agreement despite their divergent EBITDA projections. This agreement is embodied in what became Section 2.3 of the APA, which reads, in relevant part (with line breaks added by the Court):

2.3 Post-Closing Adjustment. [Riiser] hereby acknowledges and agrees that the Base Consideration is based on a projected annual Store-Level EBITDA for the Business (inclusive of all Locations other than the New Acquisition Assets) being valued at approximately $8.6 million.

[GPM] shall calculate as of December 31, 2020 the actual trailing twelve months' Store-Level EBITDA for the Business (inclusive of all Locations other than the New Acquisition

---

[3]I.e., stock.

Assets).

The methodology [GPM] will use to calculate Store-Level EBITDA for the Business will be based on the same method [Riiser] used in calculating Store-Level EBITDA which was provided to [GPM] during its prior financial due diligence review of the Business, and will include the items set forth on Schedule 2.3 attached hereto, and for the avoidance of doubt, will not include any expenses related to district managers (and personnel above district managers) and will not include any corporate or accounting fees or allocations of overhead.

To the extent the actual twelve-month Store-Level EBITDA between January 1, 2020 and December 31, 2020 is $8.6 million or greater, no amount will be owed to [GPM].

To the extent the actual twelve month Store-Level EBITDA between January 1, 2020 and December 31, 2020 is less than $8.6 million,

(i) [GPM] shall notify [Riiser] by no later than March 31, 2021 of the exact calculation of such actual trailing twelve months Store-Level EBITDA and shall provide [Riiser] reasonably acceptable evidence substantiating the same, which shall include, without limitation, profit and loss statements per Location in Excel, and

(ii) provided [GPM] and [Riiser] are in agreement (or upon them being in deemed agreement as set forth below) with such calculation, [Riiser] shall pay to [GPM] an amount equal to the lesser of

(x) $3,375,000 and

(y)(i) the amount such actual December 31, 2020 trailing twelve month Store-Level EBITDA for the Business (inclusive of all Locations other than the New Acquisition Assets) is less than $8.6 million multiplied by (ii) 4.5.

For example, if the actual twelve-month Store-Level EBITDA between January 1, 2020 and December 31, 2020 is $8.3 million, [Riiser] will be required to pay [GPM] $1,350,000.

If [Riiser] disagrees with such calculation, or has questions

about such calculation, [Riiser] shall have the right to test the accuracy of such calculation, and [GPM] will provide [Riiser] with any additional information reasonably requested used to calculate the actual twelve month Store-Level EBITDA between January 1, 2020 and December 31, 2020.

In lieu of paying [GPM] cash in the amount calculated in the prior sentence, [Riiser] can tender to [GPM] the number of MLP Units which were received by the Seller as provided in Section 4.3(y) hereof (using the same value ascribed to the MLP Units in Section 4.3(y)) equal in value to the amount calculated in the prior sentence.[4]

If any disputes that cannot readily be settled between the Parties arise as to the calculation of such actual December 31, 2020 trailing twelve months Store-Level Adjusted EBITDA, the Parties shall submit their disagreement to the Independent Auditor for review and resolution of all matters (but only such matters) that remain in dispute, and the decision of the Independent Auditor shall be final and binding on the Parties. [Language about allocation of Independent Auditor fees and expenses excluded.]

### 2.3 GPM's 2020 Store-Level Experience and Section 2.3 Submission

GPM operated the sixty-four retail fuel businesses and convenience stores purchased from Riiser between and including January 1, 2020 and December 31, 2020. The sixty-four locations were open on a daily basis,

---

[4]Under Section 4.3(y) of the APA and the Unit Pledge and Security Agreement, which was related to but distinct from the APA, Riiser pledged 69,188 Class X MLP Units of GPM Petroleum LP, a Delaware limited partnership, which served as collateral for claims made under those provisions. *See* ECF No. 34 at 29–31. Pursuant to this arrangement, GPM Petroleum LP has been paying Riiser a monthly distribution on these units, which Riiser has held since their issuance. *Id.* As of the second anniversary of the Effective Date of the Security Agreement, there were not in the aggregate outstanding or otherwise unresolved indemnity claims of GPM pursuant to the APA. *Id.* As noted *infra* Section 3.4, the contract provisions surrounding these MLP Units are immaterial to disposition of the disgorgement issue, and their text has been excluded.

subject to a handful of brief closures due to cleaning and sanitization or shortened hours.

On February 15, 2021, Eyal Nuchamovitz, an Executive Vice President at GPM Investments, LLC ("Nuchamovitz"), emailed Riiser's President Don Draughon ("Draughon") an Excel spreadsheet with GPM's EBITDA calculation and profit and loss statements by location for the sixty-four stores. In this submission, GPM calculated that the actual twelve-month Store-Level Adjusted EBITDA between January 1, 2020 and December 31, 2020 at the sixty-four stores was $5,975,000, triggering the post-closing adjustment of $3,375,000 pursuant to Section 2.3 of the APA.

Draughon subsequently corresponded with Nuchamovitz, expressing concerns that GPM's EBITDA calculation was inaccurate and improperly included certain items and excluded others. Draughon later corresponded with Mark King, GPM's Vice President—Finance ("King"); Draughon requested further information on nine separate questions as to the EBITDA calculation, to which King responded. After further correspondence between Draughon and King, King stated on March 19, 2021:

> Even if you were to 1) add back the entire $365,057.50 in facilities escrow items, (which would be too much since the majority was capitalized), and 2) add back the $100,000 in retention bonuses paid the Riiser employees who stayed a year (which based on the agreement should not be backed out, since it is actual cost) and 3) add the additional $370,000[i] or so of fuel incentives that need to be allocated to the Riiser stores, all totaling $835,057.50, Riiser is still over $1 million short ($1,875,000 less $835,057.50) of the EBITDA necessary just to get to the EBITDA shortfall threshold.

> At this point I believe that there is no additional amount of work or investigation that is needed. The Riiser stores did not

achieve the necessary level of EBITDA and therefore Riiser owes GPM $3,375,000. [. . .]

**2.4    GPM's Demand Letter, Riiser's Responses, and GPM's Lawsuit**

On March 31, 2021, GPM's general counsel Maury Bricks ("Bricks") sent a demand letter to Riiser for a post-closing adjustment payment, pursuant to Section 2.3 of the APA, of $3,375,000. Consistent with Section 2.3, the letter further allowed that "[i]n lieu of paying [GPM] cash for the full amount, [Riiser] may elect to tender to [GPM] 69,188.00 Class X Units of the MLP, which has an aggregate value of $3 million [with] [t]he remaining $375,000 payable in cash[.]" GPM gave Riiser until April 9, 2022 to decide which repayment method to use. To its demand letter, GPM attached a three-page statement detailing 2020 store-level financial information for the Riiser locations.

On April 5, 2021, Riiser's outside counsel Randolph Fletcher ("Fletcher") responded, in relevant part:

> For reasons set forth in this letter, Riiser Fuels, LLC ("Riiser") does not agree to tender $3,375,000 in the form of cash and/or a combination of Class X Units and cash.
>
> The reason that an EBITDA Target was added into the APA was that GPM was not willing to accept all of the proforma adjustments that Riiser had included in the financials presented for review. Riiser had undertaken substantial improvements both inside and outside the stores[.] . . . All of these projects were undertaken with the objective of increasing future cash flow which was the driver of the proforma adjustments that were part of the financials presented to GPM. Riiser believes the $8.6 million EBITDA target would have been hit but for COVID-19 pandemic. The COVID-19 pandemic had a material adverse effect on the C-Store business that was not contemplated by the parties and

prevented the Riiser stores from reaping the benefit of the improvements made by Riiser.

On March 15, 2020, the Governor of Wisconsin, and other government authorities, started issuing executive orders requiring "stay at home" restrictions. Although c-stores were considered essential businesses, all self-service foods and/or beverages were banned. This ban was in effect statewide until October of 2020 but persists in some counties or cities, such as Milwaukee, to this date. These orders directly resulted in the stores missing the EBITDA target.

Specifically, COVID-19 resulted in a year over year reduction in gallons of 12.7 million at the Riiser stores for the period from January 1, 2020 to December 31, 2020. This was an [sic] 21.3% reduction which we understand was similar to the chainwide reduction for GPM. Using the actual fuel margins for the Riiser stores multiplied by the fuel volume decrease results in missing EBITDA of $4.19 million.

Additionally, lost fuel volume of 12.7 million gallons results in approximately 1.27 million fewer customer visits assuming an average of 10 gallons per customer. Assuming 35% of these fuel customers enter the store and that the merchandise average was $9 per customer visit, this would result in $4 million in additional inside sales multiplied by the actual 25% inside gross margin generated by the Riiser stores which would equal $1.0 million in missing EBITDA.

Further, there are additional costs and expenses reducing EBITDA that should not have been included in the GPM calculation:

$100,000 in retention bonus paid by GPM; $370,000 in fuel incentives that had not been allocated to the Riiser stores, and $365,000 in facilities escrow items, for a total of $835,000. Riiser had also paid a retention bonus, so it should not have to pay twice. In addition, including the retention bonus in the calculation varies from the "same methodology Seller used" as required by the APA, and APA Schedule 2.3 does not specify any "stay bonus" as part of the EBITDA calculation. Facilities escrow items of $365,000 were not verified so we are not sure if this has any double counting, but it is evident that

repair and maintenance was significantly higher in 2020 than what made up the $8.6 million EBITDA target.

With these adjustments, the 12 months EBITDA would be $11,925,000 as shown on the attached Exhibit. [Exhibit omitted.]

But for the Covid-19 pandemic, the Riiser stores would have exceeded the EBITDA target stipulated by the APA by $3,325,000. We realize the APA does not deal with the pandemic, which was clearly an unforeseen event beyond the control of either party. The pandemic brought about conditions vastly different than what the parties envisioned when they entered into the APA. These conditions made it impossible for the stores to meet the EBIDTA [sic] target due to reduced revenues and increased operating costs. Many courts are fashioning equitable remedies in regard to commercial contracts between sophisticated parties because the pandemic could not have been anticipated. Riiser is willing to take its chances in the Wisconsin courts.

Please advise if GPM would like to engage in settlement discussions prior to a lawsuit to determine the outcome.

On April 21, 2021, Riiser's outside counsel Fletcher wrote a second letter to Bricks and GPM, stating that Riiser's board had rejected GPM's offer to resolve the post-closing EBITDA calculation dispute, and further stated, in relevant part:

As outlined in my previous correspondence dated April 5, 2021, there are several ways the target EBITDA would have been met but for COVID-19. [. . .]

Since GPM appears intractable in their position, we see no way forward except to have a court decide this matter. We regret having to resort to this avenue due to its effect on potential future transactions between the parties, but we are preparing for such eventuality.

Please advise if GPM would like to engage in settlement discussions prior to a lawsuit to determine if the parties can settle the matter. From Riiser's perspective, any settlement

would have to take into account the effect of the COVID pandemic on the results of operations.

GPM's Bricks responded via letter to Riiser on April 29, 2021, reiterating its demand for $3,375,000. GPM filed the complaint in this action the next day, on April 30, 2021.

### 2.5 The COVID-19 Pandemic

When the parties negotiated and signed the APA on September 27, 2019, COVID-19 was a disease unknown to GPM and Riiser. Neither party caused the COVID-19 pandemic, nor was it controllable by either party.

In response to the COVID-19 pandemic, Wisconsin Governor Tony Evers declared a public health emergency, and State of Wisconsin officials issued two orders that, among other things, restricted non-essential business and travel. Additionally, under these orders, GPM was obligated between March 17, 2020 and May 15, 2020 to: (1) close dining areas in its locations; (2) limit store occupancy to 25 percent of total occupancy; and (3) not sell self-serve food and beverages. City of Milwaukee and Winnebago County COVID-19 orders also impacted GPM's ability to sell self-serve food and beverages at store locations in those areas.

### 2.6 Alleged Damages

GPM seeks the following itemized damages: (1) $3,375,000 as a post-closing adjustment to the Closing Purchase Price under the APA; (2) interest on the Post-Closing Adjustment to the Closing Purchase Price from the date Riiser wrongfully refused to pay amounts owed through judgment; (3) disgorgement of distribution payments on MLP Units to which Riiser was not entitled after Riiser breached the APA; (4) interest on distribution payments made to Riiser on the MLP Units after Riiser breached the APA through judgment; and (5) costs and legal fees to pursue

and recover amounts owed by Riiser under the APA that should be awarded as additional damages pursuant to Section 14.9 of the APA.

To date, Riiser has not made any payments under the Post-Closing Adjustment required by the APA and has denied any obligation to do so.

## 3.  ANALYSIS

The parties' cross-motions for summary judgment revolve around the same set of issues. GPM argues that this is a straightforward breach of contract case,[5] and the undisputed facts show Riiser is liable for the post-closing adjustment to the Closing Purchase Price and, in failing to pay it, has breached its obligations under Section 2.3 of the APA. ECF No. 37 at 1. Riiser defends, and supports its own motion, by arguing (1) that the APA created two conditions precedent, which GPM failed to fulfill, and independently (2) that the COVID-19 pandemic, and related government orders, frustrated Riiser's purpose in agreeing to the APA—either or both of which excuse Riiser's performance under the contract. ECF Nos. 47 at 4–5 and 51 at 4–5. Riiser additionally argues that, regardless of the resolution of the breach of contract claim, GPM's claim seeking disgorgement of distributions made to Riiser for the MLP Units Riiser received in the sale should be dismissed, because those Units were pledged as security under a separate agreement from the APA. ECF Nos. 47 at 5 and 51 at 6. For the reasons stated in this Section, the Court will deny in part and grant in part Riiser's motion for summary judgment and grant in part and deny in part GPM's motion for summary judgment.

---

[5]The parties appear to agree the APA was a valid contract. *See* ECF No. 37 at 7 (GPM's opening brief). The Court treats this element of a breach of contract claim as uncontested. *See Schuetta v. Aurora Nat. Life Assur. Co.*, 27 F. Supp. 3d 949, 957 (E.D. Wis. 2014) (naming elements of a breach of contract claim under Wisconsin law).

### 3.1 Conditions Precedent

The first matters to which the Court turns are whether the APA imposed on GPM two conditions precedent it was required to fulfill before it was entitled to the post-closing adjustment on the Closing Purchase Price, and, if so, whether GPM failed to abide by those conditions. The two conditions precedent that Riiser alleges the APA created, and which GPM failed to follow, are (1) to provide an actual 2020 EBITDA figure for the sixty-four locations that was calculated according to certain substantive and methodological requirements and (2) to submit disputes about the actual 2020 EBITDA calculation to an Independent Auditor.

The Court applies Wisconsin contract law to interpret the APA. *See supra* Section 2.1 (noting parties' agreement as to applicable law). Under this body of law, "[a] condition precedent in a contract must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies." *Nixon v. Farmers Ins. Exch.*, 201 N.W.2d 543, 544 (Wis. 1972) (internal citation omitted). "The satisfaction of a condition precedent," where one is found, "is generally subject to the rule of strict compliance." *Evergreen Square of Cudahy v. Wis. Housing & Econ. Dev. Auth.*, No. 13-CV-743-JPS, 2016 WL 53871, at *10 (E.D. Wis. Jan. 4, 2016) (internal citations and quotations omitted).

To determine whether a contract embodies a condition precedent to performance, "the essential thing is for the court to look at the contract from the standpoint of the parties at the time they executed it, and the purpose they had in view in doing so." *Locke v. Bort*, 103 N.W.2d 555, 558 (Wis. 1960) (citation omitted). A court may consider "the language used, the situation of the parties, and the subject-matter of the contract, as presented by the evidence." *Id.* (citation omitted). "It is sometimes stated that there is a

presumption against a contract clause being construed as a condition precedent," however, "the process of interpretation will usually be decisive without making use of this presumption." *Id.* (internal citation omitted); *see also Evergreen Square*, 2016 WL 53871, at *10 (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 778 (7th Cir. 1996)) (noting that the Court may not read unambiguous provisions out of a contract, but that, at the same time, conditions precedent "'will not be read into a contract unless required by the plain, unambiguous language'").

### 3.1.1 Condition Precedent as to the Actual 2020 EBITDA Calculation

Riiser argues GPM is not entitled to the post-closing adjustment because GPM failed to comply in form and substance with Section 2.3's requirements in calculating the actual 2020 EBITDA figure for the sixty-four locations that were the subject of the APA. ECF Nos. 47 at 8–16 and 51 at 8–18. The Court disagrees and finds that GPM met the obligations imposed by Section 2.3.

### 3.1.1.1 Riiser Has Not Waived Its Affirmative Defense as to the Actual 2020 EBITDA Calculation

As a threshold matter, the Court rejects GPM's argument that Riiser has waived its right to object to the EBITDA calculation. GPM alleges that Riiser was required to challenge to the 2020 EBITDA calculation by raising the affirmative defense of payment "or any other similar affirmative defense challenging the amount demanded by GPM," but failed to do so. ECF No. 49 at 4–6. It is true that, in general, an affirmative defense not timely pled is waived and may not be raised for the first time on a

dispositive motion. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482–484 (7th Cir. 2019). However, GPM's argument here misses the mark.

First, GPM conflates the payment defense with the defense Riiser has actually raised: failure of a condition precedent. But—at least to the extent it argues it might be excused from performance for failure of a condition precedent—Riiser is not so much challenging the 2020 EBITDA figure itself as it is challenging GPM's process of arriving at that figure and whether GPM did what Section 2.3 required of it. *See* ECF No. 47 at 14 ("The point is not about who is right…"). Even accepting GPM's characterization of the payment defense as "broadly speaking . . . [any] dispute over the amount demanded on a contract," ECF No. 49 at 5 (a proposition that, in this Court's view, is not entirely substantiated by the Seventh Circuit's statements in *A.D.E. Inc. v. Louis Joliet Bank & Tr. Co.*, 742 F.2d 395, 397 (7th Cir. 1984)), GPM misstates the defense Riiser has raised. Riiser is not strictly arguing that the 2020 EBITDA as calculated by GPM *is* wrong, but rather that it *might* be wrong. While the Court has no doubt Riiser would like to avoid any responsibility for the post-closing adjustment, that is not quite the relief Riiser seeks by raising the failure of a condition precedent defense. *See* ECF No. 47 at 17 (conceding that "GPM's failure [to submit the EBITDA dispute to an independent auditor] excuses Riiser's performance . . . at the very least . . . until after GPM has complied with all its obligations under the APA").

Second, GPM was on notice of this defense. From the time of its Answer, Riiser has raised "failure of a condition precedent" as a defense, ECF No. 24 at 16, and litigates at summary judgment on this same theory. GPM has assented to the inclusion of many facts pertaining to the parties' back-and-forth about the 2020 EBITDA calculation. The most logical conclusion to be drawn from these circumstances is that GPM knew that

Riiser was preparing to challenge the EBITDA calculation process. GPM may not now complain that it was ambushed by Riiser's defense, and in any case, has had ample opportunity to address the issue in its response to Riiser's motion and its reply brief on its own motion.

### 3.1.1.2 Section 2.3 Created a Condition Precedent, But Did Not Condition GPM's Entitlement to the Post-Closing Adjustment on Compliance with a Specific Method for Calculating Actual 2020 EBITDA

The issue of waiver of this affirmative defense is where the Court's agreement with Riiser ends, however. Although Riiser has validly raised the failure of a condition precedent defense, in the end, the defense fails.

Riiser alleges that Section 2.3 conditioned GPM's recovery of any post-closing adjustment from Riiser on strictly following certain requirements in calculating the actual 2020 EBITDA to serve as the basis of that adjustment. Specifically, Riiser argues that Section 2.3 required GPM, in calculating the actual 2020 EBITDA, to follow certain steps, including: (1) employing the exact same method Riiser had used to calculate the projected EBITDA during APA negotiations; (2) including all the items set forth in Schedule 2.3; and (3) excluding any allocations of corporate overhead. *See* ECF No. 47 at 9. Riiser alleges that GPM's February 2021 calculation did not meet these requirements, and that its submission ultimately calculated operating profit (a financial metric distinct from EBITDA). *Id.* Absent precise fulfillment of these conditions and provision of the actual 2020 EBITDA, Riiser's argument goes, the Court should not allow GPM to recover any post-closing adjustment, or at the very least, should bar GPM from recovery until it follows these conditions. *Id.* at 8, 17.

Considering the language of Section 2.3, as well as the parties' standpoints and purposes at the time of executing the APA—juxtaposed with the presumption against finding conditions precedent—the Court is not persuaded to adopt Riiser's construction of the APA. *Locke*, 103 N.W.2d at 558. Section 2.3 does create a condition precedent—it conditions GPM's entitlement to the post-closing adjustment, in part,[6] on provision of an actual 2020 EBITDA calculation supported by reasonably acceptable evidence (an obligation GPM met, *see infra* Section 3.1.1.3), and notice to Riiser. Section 2.3, in other words, requires that GPM substantiate its claim to the post-closing adjustment, but does not explicitly or unambiguously condition the validity of that claim upon GPM following certain methodological steps.

This is shown in the language of Section 2.3. The methodology for calculating actual 2020 EBITDA is spelled out as follows:

> [GPM] shall calculate as of December 31, 2020 the actual trailing twelve months' Store-Level EBITDA for the Business[.] . . . The methodology [GPM] will use to calculate Store-Level EBITDA for the Business will be based on the same method [Riiser] used in calculating Store-Level EBITDA which was provided to [GPM] during its prior financial due diligence review of the Business, and will include the items set forth on Schedule 2.3 attached hereto, and for the avoidance of doubt, will not include any expenses related to

---

[6] The APA also required the parties to *agree* to the actual 2020 EBITDA calculation before Riiser was obligated to refund a portion of the Closing Purchase Price. As discussed *infra* Section 3.1.2, the APA contemplated two methods for securing the parties' agreement about the actual 2020 EBITDA calculation, including submission of bona fide disagreements, once identified as such, to an Independent Auditor. Involvement of the Independent Auditor in the event the parties did not agree about the EBITDA calculation was therefore, itself, a condition precedent to imposition of the post-closing adjustment. However, Riiser has waived as a defense the parties' failure to submit their disputes to an Independent Auditor.

district managers (and personnel above district managers) and will not include any corporate or accounting fees or allocations of overhead.

Recovery of the post-closing adjustment is subject to the following:

To the extent the actual twelve-month Store-Level EBITDA between January 1, 2020 and December 31, 2020 is $8.6 million or greater, no amount will be owed to [GPM].

To the extent the actual twelve month Store-Level EBITDA between January 1, 2020 and December 31, 2020 is less than $8.6 million,

(i) [GPM] shall notify [Riiser] by no later than March 31, 2021 of the exact calculation of such actual trailing twelve months Store-Level EBITDA and shall provide [Riiser] reasonably acceptable evidence substantiating the same, which shall include, without limitation, profit and loss statements per Location in Excel, and

(ii) provided [GPM] and [Riiser] are in agreement (or upon them being in deemed agreement as set forth below) with such calculation, [Riiser] shall pay to [GPM] an amount equal to the lesser of

(x) $3,375,000 and

(y)(i) the amount such actual December 31, 2020 trailing twelve month Store-Level EBITDA for the Business (inclusive of all Locations other than the New Acquisition Assets) is less than $8.6 million multiplied by (ii) 4.5.

Section 2.3 additionally specifies that

If [Riiser] disagrees with such calculation, or has questions about such calculation, [Riiser] shall have the right to test the accuracy of such calculation, and [GPM] will provide [Riiser] with any additional information reasonably requested used to calculate the actual twelve month Store-Level EBITDA between January 1, 2020 and December 31, 2020. [. . .]

If any disputes that cannot readily be settled between the Parties arise as to the calculation of such actual December 31,

2020 trailing twelve months Store-Level Adjusted EBITDA, the Parties shall submit their disagreement to the Independent Auditor for review and resolution of all matters (but only such matters) that remain in dispute, and the decision of the Independent Auditor shall be final and binding on the Parties.

The methodology for calculating actual 2020 EBITDA is specified separately from the conditions for recovery of the post-closing adjustment, and the latter is not explicitly or unambiguously conditioned on strict compliance with the former. *See Evergreen Square*, 2016 WL 53871, at *10 (conditions precedent "'will not be read into a contract unless required by the plain, unambiguous language'").

Recovery for the post-closing adjustment *is* unambiguously premised on fulfillment of certain conditions—GPM's notification to Riiser of the EBITDA calculation, providing Riiser evidence thereof, and the parties' agreement as to the calculation. This is clear from the use of language that is both mandatory ("shall notify," "shall provide") and conditional ("To the extent," "provided"). However, use of the previously-stated methodology to calculate EBITDA is not listed or referenced among those mandatory conditions. The language of these two separate provisions reflects that the parties agreed GPM was required to substantiate its actual 2020 EBITDA calculation before it was entitled to the post-closing adjustment. However, the language does not reflect a straightforward or unambiguous agreement that GPM's recovery of the post-closing adjustment was subordinate to its precisely following the previously-stated methodology (in addition to meeting the other mandatory conditions).

While differentiating between these two provisions of Section 2.3 may seem overly formalistic, when comparing this language against cases

where the operative contract language *was* found to create a condition precedent, the Court must conclude that only the latter provision constitutes a condition precedent. These cases require the contractual language to speak with abundant clarity in order to find a condition precedent to performance has arisen. For example, this Court, in *Evergreen Square*, found that the following language conditioned the defendant public housing agency's contractual duty to make a rent adjustment on the plaintiff property owner's requesting of such adjustment:

> [Plaintiff's] contract provides that, '[u]pon request from the owner to [Defendant], Contract Rents will be adjusted on the anniversary date of the . . . [c]ontract in accordance with 24 CFR Part 888 and this [c]ontract. See, however, paragraph (d).'

2016 WL 53871, at *5. The Court found the contract's plain language undermined the property owner's argument that it was entitled to an automatic rent adjustment when it had not requested one. *Id.* at *10. Additionally, the Court rejected the property owner's argument that the contract's specification that rent adjustment be made "in accordance with" federal regulations reflected the parties' intent that rent adjustments occur automatically (if such federal regulations would have allowed it), even absent the owner's request. *Id.* The Court found the reference to the federal regulations "merely state[d] the manner in which" the condition would be fulfilled once triggered, but did not affect the contract's plain-language requirement that an adjustment be requested before the housing authority had the duty to perform such an adjustment. *Id.*

Similarly, the Wisconsin Supreme Court has declined to recognize conditions precedent that are not expressed in the contract's plain language. *See, e.g., Sprecher v. Weston's Bar, Inc.*, 253 N.W.2d 493, 496–97 (Wis. 1977)

(holding that, where lease's explicit terms required defendant to surrender liquor license to plaintiff at lease termination, plaintiff had not failed to fulfill a condition precedent to recover for breach of the lease by failing to *request* surrender of the license). As in *Sprecher*, and as in *Evergreen Square*—where the Court declined to read unambiguous language *out* of a contract—the Court will not in the present case read *in* a requirement that the plain language of the contract does not exhibit.

The plain language of Section 2.3 states that GPM's entitlement to the post-closing adjustment depended on it notifying Riiser of the actual 2020 EBITDA and providing evidence thereof, and the parties agreeing to the calculation, but does not state that such entitlement depended on exact use of the methodology specified in the preceding portion of the contract. The reference to "reasonably acceptable evidence" does not explicitly incorporate the methodology stated earlier in Section 2.3—at best, this reference *suggests* a manner in which actual 2020 EBITDA may be calculated, but cannot be said to impose fulfillment of that specific methodology as a condition precedent. Likewise, references to "such actual trailing twelve months Store-Level EBITDA" do not make it abundantly clear that such EBITDA was to be calculated according to the specified methodology (for example, by including language such as "calculated according to the above-stated methodology" or "subject to the above-stated methodology"). To adopt Riiser's position, the Court would be required to read language into the APA that is not there; this the Court may not do. *See Evergreen Square*, 2016 WL 53871, at *10.

The out-of-circuit case Riiser offers to support its contention that Section 2.3 required strict compliance with a specified methodology before GPM could recover is distinguishable on the basis of the contract language

at issue. *See Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 117–18 (D. Mass. 1998). There, the district court found that "both the audit . . . as well as the determination of the adjusted closing net worth figure arising from the audit were conditions precedent to the effectuation of the purchase price adjustment." *Id.* at 118. In arriving at this conclusion, the court relied on the parties' use of emphatic language: "'*If* [the subject asset's] Adjusted Closing Net Worth, as defined below, . . . is less than $3,618,000, *then and only then*, the Purchase Price will be reduced.'" *Id.* at 117 (quoting parties' contract; emphasis added in order). Moreover, the court highlighted that the parties had, through a series of internal-cross references, precisely defined the adjusted closing net worth figure and how it would be calculated, and that the "event of creating the 'Adjusted Closing Net Worth, as defined below,' therefore incorporated the requirement of an audit" whose procedure was otherwise defined in the contract. *Id*. at 117–18 and n.169.

In *Davis*, the parties' agreement used much clearer language to condition the recovery of a post-closing adjustment on use of a specific procedure to determine the subject asset's closing net worth. Here, the parties' agreement employs no such explicit or obvious internal-cross references to make clear that the condition mandatory to recovery of the post-closing adjustment (defined in the "To the extent…" clause) incorporated the methodology laid out earlier in Section 2.3. It is true, as Riiser argues, that mandatory language such as "shall" and "will" is used throughout Section 2.3. ECF No. 54 at 13. However, in this case, the

presence of mandatory language alone is not enough to overcome the lack of unity and consistency between Section 2.3's provisions.[7]

Even if GPM's entitlement to the post-closing adjustment were clearly conditioned on compliance with the methodology clause, the methodology clause itself—by its own terms, and when viewed in light of the parties' situation and understanding of Section 2.3 at the time of execution—did not provide complete clarity as to how the actual 2020 EBITDA was to be calculated. *Locke*, 103 N.W. at 588–89 (stating the court may "look at the contract from the standpoint of the parties at the time they executed it" and consider "the situation of the parties . . . as presented by the evidence"). This clause requires that

> [GPM] shall calculate as of December 31, 2020 the actual trailing twelve months' Store-Level EBITDA for the Business[.] . . . The methodology [GPM] will use to calculate Store-Level EBITDA for the Business *will be based on the same method* [Riiser] used in calculating Store-Level EBITDA which was provided to [GPM] during its prior financial due diligence review of the Business, and *will include* the items set forth on Schedule 2.3 attached hereto, and for the avoidance of doubt, *will not include* any expenses related to district managers (and personnel above district managers) and will not include any corporate or accounting fees or allocations of overhead.

(emphasis added).

The language "will be based on the same method" is imprecise; the parties' own arguments (however self-serving) demonstrate its ambiguity.

---

[7]The Court again acknowledges that this analysis places a heavy weight on formalism and precision of language. However, the Court reiterates that Wisconsin courts have acknowledged that a presumption against construing contract clauses as conditions precedent may be applied where the process of interpretation of contractual language is less than decisive. *Locke*, 103 N.W. at 558.

GPM argues that the use of "based on the same method" does not "define what level of similarity" is required and instead "imposes an amorphous calculation that could be satisfied in multiple ways." ECF No. 49 at 14. Riiser, by contrast, contends that the use of "will be" requires the use of the exact same method in calculating actual 2020 EBITDA as was used in calculating the projected EBITDA. ECF No. 54 at 9.[8]

Both, frankly, are plausible readings, considering that—in view of the parties' information exchanges before executing the APA—it may not have even been possible for "the same method" to be employed. *See supra* Section 2.1; ECF No. 34 at 3 (joint statement of facts, wherein parties stipulate that Riiser's outside counsel Fletcher stated "there are a lot of financial models floating around" when sending Riiser's financial information to GPM); *see also* ECF Nos. 49 at 15 (GPM's response brief stating that "Riiser's EBITDA calculations during the due diligence period do not contain many of the items set forth in Schedule 2.3") and 54 at 14 (Riiser's reply brief stating that "Schedule 2.3 was prepared and provided by GPM itself . . . [and] GPM therefore could easily have provided all the Schedule 2.3 data"). Although the Court will not accept the parties' invitation to play accountant with their respective Excel spreadsheets cited in the briefing, the Court is persuaded that the record evidence of the

---

[8]The Court is not convinced by Riiser's argument that use of the conjunctive "and" before "will include" and "will not include" definitively reflects the parties' intention that those phrases impose two additional substantive requirements *distinct from* the use of a particular methodology (rather than simply further delineating the methodology for calculating the actual 2020 EBITDA). *See* ECF No. 54 at 14. Even if the Court adopted Riiser's position, the interpretation of Section 2.3 would hold; consistent with the Court's discussion of *Evergreen Square* and *Davis*, the condition precedent set in the parties' agreement does not incorporate by reference the use of a particular methodology, *or* either of the two requirements Riiser points to.

parties' pre-deal discussions demonstrates that they were mutually aware of some differences in the parties' accounting practices and contemplated some variation in the methodology for calculating and presenting EBITDA. *Locke*, 103 N.W. at 558. (The parties' accounting discussions around the actual 2020 EBITDA calculation bolster this conclusion. *See supra* Section 2.3 (Draughon, Nuchamovitz, and King correspondence); *see also* ECF No. 34 at 10–16.) The ambiguity of the methodology provision—both intrinsic in its language and demonstrated by how the parties understood it at the time of drafting—further reinforces that construing Section 2.3 to require strict compliance with the methodology provision as a condition for recovery of the post-closing adjustment would be improper.

In the same vein, Riiser's argument that GPM "present[ed] its financial information in a manner that undercut Riiser's ability to perform an 'apples to apples' comparison of GPM's performance on a store-by-store basis consistent with the Riiser methodology agreed to by both parties," ECF No. 47 at 10, is unpersuasive. As explained above, use of the specified methodology was not a condition precedent to recovery of the post-closing adjustment; the provision of "reasonably acceptable evidence substantiating" the actual 2020 EBITDA was. The APA as written does not straightforwardly reflect an agreement by the parties that GPM's proffered evidence of the actual 2020 EBITDA would enable an "apples to apples" comparison to be considered "reasonably acceptable evidence." Similarly, Riiser's "right to test the accuracy of" GPM's actual 2020 EBITDA calculation does not entitle Riiser to having GPM present such calculation in any particular format.

For all these reasons, the Court finds that Section 2.3 conditioned GPM's recovery of the post-closing adjustment upon GPM notifying Riiser

Case 2:21-cv-00554-JPS   Filed 12/20/22   Page 25 of 56   Document 60

of the actual 2020 EBITDA and providing evidence thereof, and the parties agreeing to the EBITDA calculation. Section 2.3 did suggest other guidelines as to how the parties would arrive at this point, however, none of them were so clear as to be susceptible to construction as conditions with which strict, exact compliance was necessary precedent to liability.

### 3.1.1.3 GPM Fulfilled Section 2.3's Condition Precedent

To be sure, although it does not require strict compliance with a specific methodology, Section 2.3 does require GPM to substantiate its claim to the post-closing adjustment. However, the undisputed facts show GPM complied with this obligation and provided "reasonably acceptable evidence" of its actual 2020 EBITDA calculation. GPM's February 15, 2021 email to Riiser's President Draughon attached "an Excel spreadsheet with GPM's EBITDA calculation and profit and loss statements by Location for the 64 stores," as required by Section 2.3. ECF No. 34 at 10. GPM representatives responded to Riiser representatives' requests for further information before issuing the March 31, 2021 demand letter, which was supported by a statement of the actual 2020 EBITDA.

Riiser's disputes of fact—which center on GPM's alleged exclusion of certain line items listed in Schedule 2.3 and alleged misallocation of corporate overhead and store-level revenues—are therefore immaterial at summary judgment. Riiser's disputes of fact would only be material if the Court found Section 2.3 conditioned entitlement to the post-closing adjustment on strict compliance with a particular methodology; the Court did not make such a finding. Even if they were material, Riiser's disputes of fact are not properly before the Court and are not supported with evidence sufficient to make those disputes genuine such that summary

judgment in Riiser's favor is appropriate or that summary judgment in GPM's favor is inappropriate.

As a preliminary matter, Riiser has introduced its disputes of fact in a procedurally improper manner. Riiser filed a statement of disputed facts (styled as "proposed findings of fact") that states, in relevant part:

> The 2021 post-closing adjustment calculation provided to Riiser by GPM . . . did not comply in form and substance with Section 2.3 of the [APA] and that failure was material to Riiser's ability to test the accuracy of GPM's proposed EBITDA calculation and claim for a purchase price adjustment.

ECF No. 40 at 1. This statement then cites to Riiser's expert Strenk's declaration, as well as to the declarations of Riiser's President Draughon and CEO Dykstra. *Id.* In turn, Riiser's briefing cites extensively to and even block-quotes from Strenk's declaration, rather than to the parties' statements of fact. *See* ECF Nos. 47 at 8–16, 51 at 7–18, and 54 at 10–14.

The Court's dispositive motion protocols require that "[a]ny disputed facts must be itemized and supported by . . . pinpoint citation[s] to the record," and that such statements be limited to one page. ECF No. 18 at 2. Further, this District's local rules require that "[a]ssertions of fact in the parties' supporting memoranda must refer to the corresponding numbered paragraph" in the parties' statements of fact; failure to comply with this requirement may result in sanctions up to and including denial of the motion. Civ. L.R. 56(b)(6), (9).[9] Riiser has flouted both requirements by

---

[9] Further, the local rules provide that, with leave of court and upon a showing that an increase is warranted, a party may file statements of fact in excess of the applicable limitations. *See* Civ. L.R. 56(b)(7). Riiser had the ability to make its case that Strenk's statements—or other record evidence pertaining to the process of calculating the 2020 EBITDA—should have been included in its statement of disputed facts, and failed to do so.

attempting to use its broad citation to the Strenk declaration in its statement of disputed facts as a cover to cite directly to Strenk's declaration in the briefs. That's simply not how it works in this District and in this Court. As a result, the Court is entitled to disregard these statements of fact. *See* Civ. L.R. 56(b)(9); *see also Kreuziger v. Milwaukee County et al.*, No. 19-CV-1747-JPS, 2022 WL 3017431, at *2 (E.D. Wis. July 29, 2022). Moreover, Riiser's decision to recount the facts in this way—effectively sending the Court on a deep-sea fishing expedition—was ill-advised, because doing so has muddied the Court's process of distilling the facts of the case to determine what matters on summary judgment.

Looking beyond the procedural deficiency, Riiser's disputes of fact have two bigger problems impeding their relevance on summary judgment. First, Riiser's dispute of fact as-written—that GPM's EBITDA submission "did not comply in form and substance with Section 2.3 of the [APA] and that failure was material"—is a legal conclusion, not a fact, and is therefore irrelevant to the Court's analysis. *See H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1015, n.6 (E.D. Wis. 2018).

Second, even if the portions of the expert declaration underlying its statement were properly before the Court, Riiser's reliance on the testimony of its expert alone is not sufficient to establish that a *genuine* dispute of fact (let alone one of material fact) exists. Where an expert has not adequately explained the factual basis and reasoning for his conclusion, his testimony is of little value. *See Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("[A]ffidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. . . . An expert who supplies nothing but a bottom

line supplies nothing of value to the judicial process.") That is precisely what has occurred here.

To support its "dispute" that GPM's EBITDA submission did not comply with Section 2.3's requirements, Riiser relies on Strenk's conclusion that GPM "failed to include the 'Fuel Sales and 'Cost of Fuel Sales' data" and other line items "identified on Schedule 2.3." ECF No. 47 at 12. Setting aside that the inclusion or exclusion of certain items is immaterial to Riiser's condition precedent defense on summary judgment because Section 2.3 did not fix such methodological requirements as a condition precedent, neither Riiser nor Strenk convincingly explains this conclusion, or demonstrates that differences between Schedule 2.3 and GPM's actual 2020 EBITDA submission are anything more than aesthetic.

Strenk's declaration explains only that "GPM does not include this information in its February 15, 2021 and March 21, 2021 EBITDA submissions." ECF No. 41 at 10. Strenk does not indicate how he knows the referenced line items were not accounted for in GPM's submissions, or even what documents he referenced to make this conclusion. Nor does he address how he knows that the supposedly missing line items were not accounted for elsewhere in GPM's submissions, despite the undisputed facts showing that the parties followed different accounting formats and conventions. *See Mid-State Fertilizer Co.*, 877 F.2d at 1339 (noting the importance of expert opinions' "discussion of hypotheses considered and rejected"). Without this information, Riiser asks the Court to either trust, without reservation, the word of an expert on Riiser's payroll, or itself play expert with the two companies' financials and conclude that one company's failure to mirror the accounting formatting of another amounts, definitively, to error. The Court will do neither.

Riiser's other disputes of fact as to whether GPM's EBITDA submission complied with Section 2.3's requirements are similarly immaterial or not genuine. Riiser's assertion that GPM "improperly placed environmental expenses at the store level that should have been allocated to corporate overhead," ECF No. 47 at 14, is speculative and, as above, supported only by Strenk's testimony—it does not support either granting Riiser's motion or denying GPM's motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Riiser also points to Strenk's conclusion that the submission "improperly included at least $465,057 of expenses for deferred maintenance and employee retention bonuses and improperly booked $370,000 in revenue from a . . . fuel credit to GPM's corporate parent." ECF No. 47 at 13. This is also not enough to defeat summary judgment for GPM, although Riiser here relies on more than just Strenk's expert testimony to corroborate this statement. *See* ECF No. 34 at 18–19 (joint statement of facts, showing Riiser's outside counsel Fletcher indicating to GPM representatives that Riiser believed about $835,000 of "Misc. Costs & Expenses" should have been "[a]dded [b]ack" in to the EBITDA); *see also* ECF No. 37 (GPM's brief in support of its motion for summary judgment, appearing to acknowledge these items should have been included in the EBITDA, arguing that "the difference between the two parties' calculations of actual 2020 [EBITDA] . . . was only $835,000"). An increase of $835,057 in the actual 2020 EBITDA would still have left Riiser on the hook for the $3.375 million post-closing adjustment.[10]

---

[10]GPM calculated the actual 2020 EBITDA at $5,975,000. If Riiser's proposed corrections were made, the actual 2020 EBITDA would have been about $6,810,000. Under the APA, Riiser was responsible for a post-closing adjustment

In sum, Riiser has not brought forward sufficient evidence to support its claims that GPM did not meet the condition precedent that Section 2.3 set (requiring that GPM notify and substantiate its claim for a post-closing adjustment), such that Riiser's motion for summary judgment should be granted. Riiser's proffered evidence of the lack of exact compliance with the methodology for calculating the actual 2020 EBITDA is immaterial and insufficient to defeat GPM's motion for summary judgment.

### 3.1.2 Condition Precedent as to Involvement of the Independent Auditor

In addition to requiring that GPM substantiate its actual 2020 EBITDA calculation, which GPM did, as noted above, Section 2.3 of the APA also required the parties to agree to the actual 2020 EBITDA calculation before Riiser was obligated to repay a portion of the Closing Purchase Price. The APA specifies two means in which the requirement of the parties' agreement could be met, including involvement of an Independent Auditor upon identification of a dispute as to the actual 2020 EBITDA calculation. Here, the undisputed facts and, more importantly, the contract language show that the APA straightforwardly conditioned GPM's entitlement to the post-closing adjustment upon submission of identified disputes to an Independent Auditor (i.e., upon engagement of a particular one of the means of resolving disagreements that the APA contemplated). Further, the facts show that the parties' disputes likely should have been submitted to an Independent Auditor. However, the undisputed facts

_____

of either $3,375,000 or $8,600,000 minus the actual 2020 EBITDA times 4.5, whichever was smaller. The difference of $8,600,000 and $6,810,000 times 4.5 is $8,055,000—still significantly higher than $3,375,000.

further show that Riiser has waived as a defense any failure by GPM to meet this condition. Due to Riiser's waiver of the defense, the Court must deny Riiser's motion for summary judgment on this basis.

### 3.1.2.1 Section 2.3 Imposed Involvement of an Independent Auditor as a Condition Precedent

Riiser argues Section 2.3 created a condition precedent as to involvement of the Independent Auditor upon identification of a dispute as to the calculation of actual 2020 EBITDA. ECF No. 47 at 16–17. GPM does not take a clear position on this issue, but its briefing suggests it concedes the point. ECF No. 49 at 13–21 (GPM's response brief in opposition to Riiser's motion, discussing only that Section 2.3's *methodology* provisions do not create conditions precedent); ECF No. 52 at 1–3 (GPM's reply brief in support of its motion for summary judgment, arguing that the Independent Auditor provision was waived without addressing whether it was a condition precedent to recovery).

The Court's independent analysis confirms that Section 2.3's language clearly imposes a condition precedent requiring that the parties submit identified disputes about the actual 2020 EBITDA calculation to an Independent Auditor before GPM was entitled to the post-closing adjustment. *See Evergreen Square*, 2016 WL 53871, at *10 (conditions precedent will not be read into a contract unless plainly and unambiguously required). Section 2.3, in addition to requiring that GPM notify Riiser of its calculation of the 2020 EBITDA and provide substantiation thereof, specifies that

> provided [GPM] and [Riiser] are in agreement (or upon them being in deemed agreement as set forth below) with such calculation, [Riiser] shall pay to [GPM] an amount [as

specified]. . . . If [Riiser] disagrees with such calculation, or has questions about such calculation, [Riiser] shall have the right to test the accuracy of such calculation, and [GPM] will provide [Riiser] with any additional information reasonably requested used to calculate the actual twelve month Store-Level EBITDA between January 1, 2020 and December 31, 2020. If any disputes that cannot readily be settled between the Parties arise as to the calculation of such actual December 31, 2020 trailing twelve months Store-Level Adjusted EBITDA, the Parties shall submit their disagreement to the Independent Auditor for review and resolution of all matters (but only such matters) that remain in dispute, and the decision of the Independent Auditor shall be final and binding on the Parties.

In contrast to the parties' lack of clear incorporation of any particular methodology into the APA's earlier reference to "reasonably acceptable evidence," here, the parenthetical "(or upon them being in deemed agreement as set forth below)" incorporates a definite procedure. The use of the disjunctive "or" in the parenthetical, as well as conditional and mandatory language throughout ("provided," "if," "shall"), demonstrates that the parties contemplated two specific methods—and no other methods—by which the parties could arrive at an agreement as to the EBITDA calculation.

The language "below," in turn, lays out these two possible methods: either the parties would voluntarily agree (either after Riiser's "test[ing] the accuracy of such calculation" with the benefit of further additional information from GPM as requested by Riiser, or without it—as presumably Riiser would not have challenged a calculation by GPM showing 2020 EBITDA to have cleared the $8.6 million threshold), or they would disagree (even after Riiser's testing of the calculation with additional information provided by GPM) to such an extent that the disagreement

would need to be submitted to an outside arbiter for resolution. These clauses together chart a coherent "if/then" pathway for fulfillment of the core condition precedent of the parties' agreement before GPM was entitled to the post-closing adjustment: if the parties do not or cannot voluntarily agree as to the actual 2020 EBITDA calculation, then their dispute must be submitted to the Independent Auditor, whose resolution of the matter will bind the parties and constitute their "deemed" agreement, such that liability for the post-closing adjustment attaches.

These provisions together make abundantly clear what is required of the parties prior to Riiser's duty to perform arises. *See Evergreen Square*, 2016 WL 53871, at *10. To be sure, the provisions still leave some significant questions open (when is a dispute considered not "readily … settled," and which party is responsible for invoking the Independent Auditor provision?). However, they lay out clear steps for satisfying the core condition precedent that the parties agree as to the actual 2020 EBITDA, and they make clear that the parties' agreement strictly requires the use of one of these two methods. Section 2.3 therefore imposes as a condition precedent that the parties submit identified disputes about the actual 2020 EBITDA calculation to an Independent Auditor before liability for the post-closing adjustment arises.

### 3.1.2.2 Riiser Has Waived Its Affirmative Defense that the Dispute Must Be Submitted to an Independent Auditor

Although Section 2.3 conditions GPM's entitlement to the post-closing adjustment on the parties' agreement as to the EBITDA calculation, and although the parties' agreement in turn was conditioned on submission of identified disputes thereto to an Independent Auditor, the Court finds

Riiser has waived its right to raise as a defense the failure of this condition precedent. The facts of the case suggest—though they do not definitively establish—that the parties disagreed as to the 2020 EBITDA calculation, to the extent that their disagreement should have been submitted to an Independent Auditor before GPM commenced this lawsuit. However, this factual dispute does not preclude summary judgment, because the undisputed facts *do* show that Riiser has acted wholly inconsistently with its right to submit the dispute over EBITDA to the Independent Auditor; in the parlance of the APA, it is in "deemed agreement" as to the EBITDA calculation.

The Court treats the Independent Auditor provision of the APA as a limited-scope arbitration agreement. *See Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 799 (7th Cir. 2005) (finding that a contract clause requiring referral to an accounting expert of the calculation of "net working capital," whose calculation would be final and binding on the parties for purposes of determining whether a post-closing adjustment would be applied to asset purchase price, constituted an arbitration agreement; additionally noting Wisconsin Supreme Court decisions validating that "Wisconsin respects the parties' ability to make agreements of this kind"). As such, "[l]ike other contractual rights . . . the right to arbitrate is waivable," and "waiver can be express or implied through action." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020). "[T]he question is whether 'based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right

to arbitrate." *Id.* (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002)).[11]

GPM argues that Riiser, from the time GPM served its March 31, 2021 demand letter, has acted inconsistently with the right to arbitrate. ECF No. 49 at 2–5. GPM states—citing from the joint statement of facts—that Riiser's April 5 and 21, 2021 letters in response to GPM's March 31, 2021 demand letter "acknowledged the existence of a dispute that could not be readily settled," but failed to invoke the Independent Auditor provision at that juncture, and instead "clearly communicated that it expected to litigate the dispute," thereby "forc[ing] this matter to litigation." *Id.* at 3. GPM further argues that, even if Riiser had timely invoked the Independent Auditor provision, or if the dispute were submitted to arbitration now, an Independent Auditor would not be capable of addressing Riiser's equitable

---

[11]Riiser has not challenged GPM's characterization of the Independent Auditor provision as an arbitration agreement. *See* ECF No. 54 at 6–9. The Court therefore analyzes the issue of waiver through this lens. *See Omni Tech*, 432 F.3d at 800 (noting that where an agreement "is valid under [state] law, whether or not it carries the label 'arbitration,' it must be implemented in full"); *see also supra* note 5 (parties agree that the APA itself was a valid contract under Wisconsin law).

As the Court has found, submission of identified disputes about the actual 2020 EBITDA calculation to the Independent Auditor was a condition precedent to GPM's recovery of the post-closing adjustment. The Court therefore notes parenthetically that, under Wisconsin law, the failure of a condition precedent in a contract is, like waiver of a right to arbitration, a waivable defense. *Variance, Inc. v. Losinske*, 237 N.W.2d 22, 37–38 (Wis. 1976) (collecting cases). While Riiser has not pleaded as an affirmative defense the existence of an arbitration agreement, it did plead the affirmative defense of failure of a condition precedent. ECF No. 24 at 15. However, because the parties seemingly concur in applying the federal arbitration-waiver standard (and have not briefed the issue as one of Wisconsin contract law), the Court will not at this time examine whether, as a matter of Wisconsin contract law, Riiser waived its right to insist on fulfillment of the condition precedent.

arguments that it should be excused from performing because of the impacts of COVID-19. *Id.* at 4. In any event, GPM argues that, after the litigation commenced, Riiser continued to act inconsistently with the right to arbitrate by failing to seek a stay of this case, filing a motion to dismiss that did not address the Independent Auditor provision, and participating in extensive discovery. *Id.* at 3–4.

Riiser, for its part, maintains that its April 5 and 21 letters evince that *both* parties acknowledged the existence of a dispute as to the actual 2020 EBITDA calculation that could not readily be resolved, and that, pursuant to the APA, *both* parties should have proceeded to submit that dispute to the Independent Auditor. ECF No. 54 at 6–7. Therefore, in Riiser's view, it upheld its end of the bargain, and GPM should have done the same before suing. Riiser agrees that an Independent Auditor would not have been capable of addressing its equitable COVID-19 defense, but—contending that the references to litigation in its April 5 and 21 letters referred primarily to submitting Riiser's equitable COVID-19 defense *to a court*—argues that its letters show it never disclaimed an intention to submit its disputes about the calculation of the actual 2020 EBITDA to the Independent Auditor. *Id.* at 8. Finally, Riiser argues that its "motion to dismiss meritless claims at the outset of litigation does not inhibit its right to later pursue dispositive relief from a properly alleged separate claim." *Id.* at 9.

The facts of the case suggest—but do not definitively establish—that the parties disagreed as to the 2020 EBITDA calculation such that their disagreement should have been submitted to an Independent Auditor before GPM commenced this lawsuit. On one hand, Riiser, on several occasions before GPM commenced this lawsuit, made clear that it was

contesting its responsibility for the post-closing adjustment on the basis that Riiser disputed at least some aspects of GPM's EBITDA calculation.

Well before GPM's March 31 demand letter—in fact, from the moment GPM submitted its first EBITDA calculation to Riiser on February 15, 2021—Riiser questioned the calculation. *See supra* Section 2.3 (Nuchamovitz, Draughon, and King correspondence). Riiser continued to press these concerns before and after GPM's March 31 demand letter. Riiser on February 18 requested more information from GPM about nine topics, such as whether any of the repair and maintenance expenses, which Riiser had essentially paid GPM to perform in 2020 on the stores it purchased, had been improperly credited to GPM in the 2020 EBITDA. *Id.*; *see also* ECF No. 34 at 10–12. On March 19, after GPM provided a response to the request, Riiser reiterated its concern and again expressed disagreement with this aspect of the EBITDA calculation. *See supra* Section 2.3; *see also* ECF No. 34 at 14–15. GPM responded by saying that, even if Riiser's suggested corrections to the allocation of the repair and maintenance expenses were made, it would make no difference to Riiser's liability for the post-closing adjustment. *See supra* Section 2.3.

GPM further stated: "At this point I believe that there is no additional amount of work or investigation that is needed. The Riiser stores did not achieve the necessary level of EBITDA and therefore Riiser owes GPM $3,375,000." *Id.* However—despite GPM's position that the matter was settled—Riiser's April 5 response to GPM's March 31 demand letter specifically continued to express disagreement about the allocation of the repair and maintenance expenses as well as retention bonuses and fuel incentives. *See supra* Section 2.4. These facts support Riiser's position that the parties disagreed as to the 2020 EBITDA calculation such that their

disagreement should have been submitted to an Independent Auditor before GPM commenced this lawsuit.[12]

On the other hand, Riiser's communications with GPM signal that its primary basis for disputing its responsibility to pay the post-closing adjustment was its belief that COVID-19 and related government orders had disrupted business such that the actual 2020 EBITDA could not be considered accurate. Six of the nine topics on which Riiser requested more information in the February 18 email pertained to COVID-19. *See* ECF No. 34 at 12–14. Riiser's April 5 response to GPM's March 31 demand letter extensively references Wisconsin's COVID-19 restrictions and figures on nationwide reduction in fuel sales, and states flatly: "Riiser believes the $8.6 million EBITDA target would have been hit but for [the] COVID-19 pandemic." The letter went on to state that "[m]any courts are fashioning equitable remedies in regard to commercial contracts" and that "Riiser is willing to take its chances in the Wisconsin courts."

---

[12]The APA did not require disputes to exceed a certain dollar amount to be submitted to the Independent Auditor. Ostensibly, under the language of the APA, even a dispute over an amount that would ultimately not have lessened or fully excused Riiser's liability for the post-closing adjustment would have to be submitted to the Independent Auditor if the parties were at an impasse over the amount. All that was required was that the parties identify, or be aware of, a dispute as to the calculation that was capable of resolution by the Independent Auditor—and the Court finds that the parties likely did know of such a dispute.

Similarly, the APA's language required "the parties" to identify and submit disputes to the Independent Auditor. The above-stated facts indicate that GPM was well aware that Riiser disputed an amount to the extent that the Independent Auditor might need to resolve the question (even if that dispute would not ultimately impact the post-closing adjustment). GPM's hair-splitting arguments that it had no responsibility to submit the dispute to the Independent Auditor because only Riiser acknowledged the disputes and because Riiser itself never invoked the Independent Auditor provision, therefore, are unpersuasive.

Moreover, Riiser's final communication to GPM on April 21, before the lawsuit began, stated *only* that it was challenging whether it owed the post-closing adjustment for COVID-related reasons, and did not reference the previous disputes over repair and maintenance costs at all:

> As outlined in my previous correspondence dated April 5, 2021, there are several ways the target EBITDA would have been met but for COVID-19. Apparently, GPM refuses to acknowledge that COVID-19 had an impact on the C-store operations and performance. [. . .]
>
> Since GPM appears intractable in their position, we see no way forward except to have a court decide this matter. We regret having to resort to this avenue due to its effect on potential future transactions between the parties, but we are preparing for such eventuality.
>
> Please advise if GPM would like to engage in settlement discussions prior to a lawsuit to determine if the parties can settle the matter. From Riiser's perspective, any settlement would have to take into account the effect of the COVID pandemic on the results of operations.

Perhaps most notably, Riiser never once explicitly referenced or invoked the Independent Auditor provision during these pre-litigation discussions, despite supposedly having what it believed to be an authentic dispute as to the EBITDA calculation. In contrast to the facts above, these facts support a finding that the parties mutually understood the crux of their disagreement over whether the post-closing adjustment was owed was whether the impacts of COVID-19 might excuse Riiser from performing—a question the Independent Auditor would not be capable of resolving, therefore not triggering any arbitration requirement under the APA (and undermining Riiser's failure of a condition precedent defense).

Ultimately, however, the debate about whether the facts show that the parties had a dispute over the EBITDA calculation that should have

been submitted to an Independent Auditor is not dispositive. Any dispute of fact is immaterial in this regard because the undisputed facts demonstrate that Riiser has, at this point, acted wholly inconsistently with its right to submit the dispute over EBITDA to the Independent Auditor. *Brickstructures*, 952 F.3d at 891. Riiser has therefore waived any defense to GPM's recovery of the post-closing adjustment on this basis. *Id.*

It is plausible that Riiser's pre-suit communications—which read as veiled threats to GPM to "mess around and find out" with respect to Riiser's equitable COVID-19 defense—were nonetheless still consistent with a desire to arbitrate with respect to the EBITDA calculation. However, this proposition breaks down upon examining Riiser's behavior once GPM commenced its suit. If Riiser had been truly concerned that GPM jumped the gun in commencing this litigation, it could have applied to this Court for a stay of proceedings immediately after the complaint was filed—it did not do so. *See* 9 U.S.C. § 3. Its failure to do so is inconsistent with an intent to arbitrate the EBITDA dispute.

Riiser argues that its filing of a partial motion to dismiss is not inconsistent with an intent to arbitrate, and rather that its motion to dismiss was simply "tak[ing] steps to protect its rights in court by successfully moving to dismiss legally groundless claims." ECF No. 54 at 8 (internal quotation omitted) (distinguishing *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585 (7th Cir. 1992)). Even if the Court credits Riiser's argument that its motion to dismiss served the goal of better positioning it to "intelligently decide whether to arbitrate," *St. Mary's*, 969 F.2d at 589, Riiser's conduct after the Court granted its partial motion to dismiss belies this claim. Riiser did not attempt to apply for a stay or involve the Independent Auditor at that point. *See Munson v. Butler*, 776 Fed. App'x

339, 342 (7th Cir. 2019) ("[A] district court has inherent power to exercise its discretion to stay proceedings to avoid unnecessary litigation of the same issues."). It actively participated in discovery. It now acknowledges but clearly does not prefer the remedy of simply returning the dispute to the Independent Auditor, *see* ECF No. 47 at 17. Riiser had time to intelligently decide whether to arbitrate; that time has now passed, and Riiser's behavior indicates that it elected not to seek arbitration.

The Court therefore finds that Riiser has waived its defense that it is excused from performing because the parties' dispute over the EBITDA calculation was not submitted to the Independent Auditor. Accordingly, and for all the reasons detailed above, Riiser's motion for summary judgment will be denied, and GPM's motion will be granted—GPM did what the APA required of it, and Riiser's performance is not excused.

### 3.2 Frustration of Purpose

As an independent basis for relief from any obligation to pay the post-closing adjustment, Riiser argues that COVID-19 and related government orders frustrated its principal purpose[13] in executing the APA. ECF No. 47 at 20. The Court finds that the present case does not meet the high bar for application of the frustration of purpose defense. Accordingly, Riiser's motion for summary judgment on this basis will be denied.

A party raising frustration of purpose as a defense to enforcement of a contract must show that: "(1) the party's principal purposes in making the

_____

[13]Riiser also makes passing reference to the distinct, but related, defense of impossibility or impracticability. ECF No. 47 at 18–19 ("[T]he doctrines of frustration of purpose and impossibility [or] impracticability have the same essential elements."). The similarity of the defenses notwithstanding, Riiser's briefing substantively discusses and applies only the frustration of purpose defense. The Court will therefore examine only that defense.

contract is [sic] frustrated; (2) without that party's fault; (3) 'by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made[.]'" *In re Est. of Sheppard*, 789 N.W.2d 616, 619 (Wis. Ct. App. 2010); *see also Chi., Milwaukee, St. Paul & Pac. R.R. Co. v. Chicago & N.W. Transp. Co.*, 263 N.W.2d 189, 194 (Wis. 1978) and *Wm. Beaudoin & Sons, Inc. v. Milwaukee County*, 217 N.W.2d 373, 377 (Wis. 1974). "[I]f the elements are met, then a party's obligations under the contract are excused." *Convenience Store Leasing & Mgmt. v. Annapurna Mktg.*, 933 N.W.2d 110, 114 (Wis. Ct. App. 2019).

However, "[p]roving frustration of purpose is generally a tall order." *Id.* at 115. In examining a party's "principal purpose" in entering the contract, "[i]t is not enough that [the party] had in mind some specific object without which he would not have made the contract[;] [t]he object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Id.* (quoting Restatement (Second) of Contracts § 265 cmt. A (Am. L. Inst. 1981)). Additionally, "[f]rustration of purpose only excuses performance where the frustration is so severe that it is not to be regarded as within the risks . . . assumed under the contract." *Id.* (internal quotation and citation omitted). "[F]rustration is not substantial merely because the transaction has become less profitable for the affected party or even that he will sustain a loss." *Id.* (internal quotation and citation omitted).

The parties have no dispute as to the second element of the defense: both agree (as common sense would have it) that neither party bears fault for nor could control COVID-19 and the related government orders. The first and third elements of the defense are in dispute. The first element of this defense really presents two issues: what was the primary purpose of

the APA, and was it frustrated by the occurrence of COVID-19 and the related government orders? The third element inquires as to whether the frustrating event was indeed one which the parties assumed would not occur. The Court addresses each issue in turn.

The principal purpose of the APA was to effectuate the sale of sixty-four locations from Riiser to GPM. Riiser goes several steps further in defining the APA's principal purpose, but the Court declines to adopt its self-serving definition. Riiser argues that its[14] principal purpose in entering the APA was to sell the sixty-four locations "at an agreed-upon price." ECF No. 47 at 20. Riiser further argues that "the parties' principal purpose of a mutually agreeable price was heavily dependent on EBITDA projections for 2020 [which] were themselves dependent on the fundamental assumption that there would not be a global public health crisis[.]" *Id.* at 21. In Riiser's view, this means the EBITDA projections, and the market assumptions on which those projections were premised, "were essential to the transaction moving forward" and therefore themselves rose to the level of a principal purpose of the APA. *Id.* The centrality of the projections to the APA is demonstrated, Riiser says, by the parties' extensive debates over what 2020 EBITDA projections were reasonable, and ultimate agreement to a purchase price that reflected a compromise as to those projections and, accordingly, incorporated the post-closing adjustment provision. *Id.* at 21–22.

_____

[14]Riiser argues at one point that the inquiry focuses on the parties' (presumably shared) principal purpose, ECF No. 47 at 20–21, but at another point insists that it is the principal purpose of the party raising the defense that matters, ECF No. 54. The latter is the technically correct statement of the law, but the distinction does not seem to make much of a difference in Wisconsin courts' analysis, *see Convenience Store Leasing*, 933 N.W.2d at 117–18 (examining "the principal purpose of the [contract] (by its own terms)" and the "fundamental premise" of the contract), or in the final analysis in this case.

Neither party disputes that the language of Section 2.3 of the APA reflects that the closing purchase price—and hence any post-closing adjustment thereto—was tied to how the sixty-four locations performed in 2020 (versus how they were projected to perform). However, GPM argues in response that Riiser's framing of the principal purpose focuses too narrowly on the specific objectives Riiser had in mind when it agreed to the APA. ECF No. 49 at 9. In GPM's view, "the parties contracted for the [p]ost-[c]losing [a]djustment to be a part of their agreement, [but] it was not so central to the contract that 'without it the transaction would make little sense.'" *Id.* (internal quotation unattributed).

The Court agrees with GPM's framing. By Riiser's logic, *any* term of the APA over which the parties spent a significant time negotiating, or without which the parties would not have had a deal, could be held to be a principal purpose of the agreement. But the frustration of purpose defense requires more: the principal purpose "must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Convenience Store Leasing*, 933 N.W.2d at 115 (quoting Restatement (Second) of Contracts § 265 cmt. A (Am. L. Inst. 1981)). A party could theoretically walk away from a deal due to a fundamental disagreement on a term that is ancillary to the purpose of the contract—for example, Riiser may have insisted that it would only accept cash payments, and no MLP Units, for the transfer of its locations to GPM, or else no deal would be made. That would not mean that that particular term of the agreement, if agreed to by GPM, suddenly becomes a principal purpose of the agreement.

Moreover, Riiser's argument that attaining an EBITDA calculation unaffected by external volatility was a principal purpose of the contract is

belied by the language of the contract itself. Riiser agreed to a post-closing adjustment provision that embodied both upside and downside risk. It accepted, with eyes wide open, that it might end up owing GPM a significant sum, even if, for any reason, its locations' earnings fell short of the $8.6 million threshold by only $750,001. The principal purpose of the contract—to execute a sale—might fairly be considered frustrated if, for example, Riiser were required to refund the *entire* purchase price if the locations failed to meet earnings projections. *Cf. Wm. Beaudoin*, 217 N.W.2d at 377 (applying frustration of purpose defense where contract obligation was completed by another party, and plaintiff therefore had no duty to perform and could not recover from defendant for work it had not completed). But there was also an upper limit to the risk Riiser assumed: the sum owed in no event would be more than $3.375 million. Riiser attempts to redefine the APA's purpose in a way that writes the risk it assumed out of the contract; the Court will not countenance such "heads we win, tails you lose" arguments.

As to the second half of the first element of the defense, the Court finds that COVID-19 and related government orders did not frustrate the parties' principal purpose in agreeing to the APA, which was to transfer the sixty-four stores from Riiser to GPM. "[F]rustration is not substantial merely because the transaction has become less profitable for the affected party or even that he will sustain a loss." *Convenience Store Leasing*, 933 N.W.2d at 115 (internal quotation and citation omitted). The locations were successfully transferred to GPM, and Riiser was compensated for that transfer. That the sale was not as profitable as Riiser hoped does not mean it became devoid of any worth whatsoever when COVID-19 affected the

locations' earnings—the sale still had value to Riiser. *Cf. Wm. Beaudoin*, 217 N.W.2d at 377.

The two out-of-circuit trial court cases Riiser cites in support of its position only reinforce the Court's conclusion. While those courts ultimately found the frustration of purpose defense applied and excused the defendants' performance, they did so after determining that the occurrence of COVID-19 rendered the parties' agreements essentially valueless. *See UMNV 205-207 Newbury, LLC v. Caffe Nero Americas Inc.*, No. 2084CV01493-BLS2, 2021 WL 956069, at *5 (Mass. Super. Feb. 8, 2021) (finding defendant café's purpose in entering lease was frustrated where lease provided that it could operate a café for no other purpose than indoor dining, and government order addressing COVID-19 prohibited indoor dining); *Bay City Realty, LLC v. Mattress Firm, Inc.*, No. 20-CV-11498, 2021 WL 1295261, at *7 (E.D. Mich. Apr. 7, 2021) (same conclusion, where lease provided defendant could operate a store for retail use and "incidental" storage and office use, and government order addressing COVID-19 prohibited both nonessential retail business operations and use of office space for in-person work). It is not the case here that the parties' agreement became valueless due to COVID-19 and related government orders.

Finally, the Court finds the parties do not have any sincere dispute as to the third element of whether the parties, when they made their contract, were operating on the basic assumption that the frustrating event would not occur. The parties agree that neither expected a pandemic and subsequent government-mandated business closures would occur. *See* ECF No. 49 at 12 (GPM's brief in opposition to Riiser's motion stating "[t]here is, of course, no dispute that the [p]arties did not anticipate that a particular

strain of coronavirus would emerge . . . and spread[.]")[15] But that is not the key inquiry. When the parties made their contract, they contemplated, and were explicitly operating on the assumption, that external forces might impact the locations' earnings, and laid out a contingency plan for that eventuality. While nobody expected that eventuality would take the form of a pandemic and subsequent government-mandated business closures, Riiser knew an eventuality requiring its repayment of a post-closing adjustment to the purchase price—up to and including an adjustment in the amount of $3.375 million— could potentially manifest.

Even if the particular circumstance of a global pandemic that led to government-enforced business restrictions was not within the parties' contemplation when they formed the APA, the Court cannot say the risk of market conditions depressing the locations' earnings "[was] not to be regarded as within the risks . . . assumed under the contract." *Convenience Store Leasing*, 933 N.W.2d at 115. Riiser is correct that the lack of a force majeure clause in Section 2.3 of the APA does not necessarily mean that Riiser accepted the risk of any and all business conditions that might impact the locations' earnings. *See* ECF No. 54 at 18. Force majeure and frustration of purpose are separate defenses, with the former dependent on the

_____

[15]GPM briefly contends that "Riiser [cannot] convincingly argue that a pandemic was not a foreseeable event" in light of "notable pandemics in the decade before the APA was executed." ECF No. 49 at 13; *see also* ECF No. 50 (GPM's statement of disputed facts, referencing the H1N1, MERS, Ebola, and Zika epidemics). Because the Court ultimately concludes that the purpose of the APA was not frustrated by the COVID-19 pandemic, it need not examine the particulars of whether prior pandemics and epidemics, and the public health responses to them, were of the same breadth and scope as COVID-19 such that sophisticated contracting parties would foresee and assume the risks associated with such emergencies.

contract language and the latter an equitable defense. *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 276 (7th Cir. 1986). But the fact that the APA does not include a force majeure clause, thus entitling Riiser to raise the frustration of purpose defense now, does not prove that the parties did not contemplate the risk of operating below projected earnings in 2020.

For these reasons, the Court cannot conclude the COVID-19 pandemic and related government orders frustrated Riiser's principal purpose in entering into the APA, which was to sell sixty-four of its locations to GPM. The Court must therefore deny Riiser's motion for summary judgment on this basis.

### 3.3 Breach of Contract

Having found that none of Riiser's claimed defenses excuse its performance under the APA, the Court briefly turns to the substance of GPM's motion for summary judgment, which claims simply that Riiser breached the APA and GPM is entitled to damages. ECF No. 37 at 7–8. The motion will be granted.

Under Wisconsin law, a breach of contract claim has three elements: (1) the existence of a valid contract; (2) a breach or violation of the terms of that contract; and (3) damages. *Schuetta*, 27 F. Supp. 3d at 957 (citing Wisconsin cases). Here, the parties agree the APA was a valid contract, *see supra* note 5. To be sure, their execution of the APA constituted both offer and acceptance, and neither party has challenged that they exchanged consideration pursuant to the APA. *Piaskoski & Assocs. v. Ricciardi*, 686 N.W.2d 675, 679 (Wis. Ct. App. 2004) ("A valid contract requires an offer, acceptance[,] and consideration. . . . Offer and acceptance exist when the parties mutually express assent, and consideration exists if the parties manifest an intent to be bound to the contract.").

As to the element of breach, Riiser does not dispute that it has not paid GPM the post-closing adjustment as GPM demanded on March 31, 2021. As discussed above, Riiser is not excused from performance. As such, Riiser has breached the contract by refusing to pay the amount owed as a post-closing adjustment to GPM.

Riiser has not introduced a genuine dispute of material fact as to the amount of damages GPM has sustained due to Riiser's non-performance. The actual 2020 EBITDA for the sixty-four locations that were the subject of the APA was $5,975,000; 4.5 times the difference between $8,600,000 and this amount greatly exceeds $3,375,000. Therefore, under the terms of Section 2.3 of the APA, Riiser is responsible for payment of the post-closing adjustment in the amount of $3,375,000. Pursuant to Section 2.3 of the APA, Riiser may elect to pay this amount in cash or by tendering, to GPM, MLP Units it received pursuant to the APA.

### 3.4 Damages and Disgorgement

As the Court just noted, Riiser is responsible for payment of contractual damages under Section 2.3 of the APA, and may elect to do so in one of two ways. The parties further argue about what remedies and damages are available beyond those specified in Section 2.3. The Court finds that GPM is not entitled to disgorgement, and grants Riiser's motion for summary judgment in part on this limited ground. The Court further finds that GPM is entitled to pre-judgment interest and reasonable costs, including attorneys' fees and expenses.

GPM argues that "[t]o the extent [the $3.375 million] would have been comprised of the returned MLP units, Riiser's refusal to refund those units has resulted in Riiser's continued receipt of distributions on those units that would not have been received but for their wrongful retention."

ECF No. 37 at 7; *see also* ECF No. 49 at 21–22 (GPM's brief in opposition to Riiser's motion, arguing that "[a]lthough Riiser could have made good on its contractual obligations by refunding a commensurate quantity of MLP Units" to satisfy its obligation for the post-closing adjustment, Riiser failed to do so and may not now "profit by way of its breach"). GPM therefore requests that the Court order disgorgement of distributions Riiser has received on the MLP Units Riiser has retained since the time of its breach. ECF No. 37 at 7. At the very least, GPM argues, "it would be premature to grant summary judgment to preclude GPM's disgorgement claim." ECF No. 49 at 22.

Riiser moves the Court to preclude any disgorgement remedy. ECF No. 47 at 29–31. It responds that, essentially, because it had a choice of how to pay any post-closing adjustment, it cannot now be held accountable for the consequences of a choice it declined to make at the time GPM served its demand letter. *Id.* at 29–30. Riiser further argues that those MLP Units were tendered to it under another provision of the APA, Section 4.3(y), for another purpose (satisfaction of potential indemnity claims by GPM), and on which contractually-mandated distributions would be made to Riiser. *Id.* at 30.

"[D]isgorgement—a remedy that measures and strips a defendant of wrongfully derived profits—is generally unavailable in a breach of contract [case]." *Country Visions Coop. v. Archer-Daniels-Midland Co.*, 946 N.W.2d 169, 186 (Wis. Ct. App. 2020), *aff'd*, 958 N.W.2d 511 (Wis. 2021) (quoting Restatement (Third) of Restitution and Unjust Enrichment §§ 39, 44, 49, 51 (Am. Law Inst. 2011)). However, disgorgement may be available where a party engages in a deliberate and opportunistic breach and contractual damages are inadequate. Restatement (Third) of Restitution and Unjust

Enrichment § 39. "A case in which damages afford inadequate protection to the promisee's contractual entitlement is ordinarily one in which damages will not permit the promisee to acquire a full equivalent to the promised performance in a substitute transaction." *Id.*

Here, the Court finds disgorgement is not appropriate. The contractual damages afford GPM adequate protection: by paying the $3.375 million post-closing adjustment, either in cash or in MLP Units together with prejudgment interest as discussed below, Riiser will not be delivering less than what was promised when the parties executed the APA. GPM's accusation that "Riiser's breach has given [it] financial incentive to take longshot positions . . . and to take an otherwise irrational, uncompromising stance towards litigation," ECF No. 52 at 13, is mostly rhetoric and moreover is unsupported by the record; although the Court does not ultimately agree with Riiser's arguments, it does not agree that Riiser was litigating frivolously or in bad faith.

The Court also disagrees that "[d]isgorgement is the only way that GPM will be made whole for the distributions that it would have received had Riiser complied with its contractual obligation to refund the MLP Units," ECF No. 49 at 21, because Riiser was never obligated *specifically* to refund the MLP Units—it always had, and continues to have, a choice for how to pay any post-closing adjustment that is due. The fact that GPM's March 31, 2021 demand letter gave Riiser the option of satisfying the post-closing adjustment amount by tendering MLP Units which were received as provided in Section 4.3(y) of the contract is immaterial in light of the fact that, by Section 2.3's terms, Riiser retains the choice of how to pay the post-closing adjustment. Accordingly, Riiser's motion for summary judgment

will be granted in this very narrow regard, and GPM will be precluded from disgorging distributions on the MLP Units.

Separately, GPM moves for prejudgment interest, at a rate of 5% per year pursuant to Wis. Stat. § 138.04, on the post-closing adjustment amount of $3,375,000 and "any dividends that Riiser has improperly received as a result of its ongoing breach." ECF No. 37 at 8. Riiser does not argue against GPM on this point or address prejudgment interest at all in its submissions. *See generally* ECF Nos. 51 and 54. The Court will therefore presume that Riiser concedes that, if it is found liable for the post-closing adjustment, it is also liable for prejudgment interest on that amount. *See Wojtas v. Cap. Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007).

Because the breach here consists of a failure to pay a definite sum, the Court finds GPM is entitled to prejudgment interest to at the rate of 5% per year, applicable to the post-closing adjustment amount of $3,375,000, which was due on March 31, 2021. *See* Wis. Stat. § 138.04; *Trease v. Tri-State Adjustments, Inc.*, 934 F. Supp. 2d 1016, 1019 (E.D. Wis. 2013) (quoting Restatement (Second) of Contracts § 354(1) (Am. Law. Inst. 1981)) ("Wisconsin courts follow the approach outlined in the Restatement Second of Contracts, which states, 'If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.'"). To the extent Riiser elects to pay the $3,375,000 by returning MLP Units rather than paying in cash, the 5% prejudgment interest calculation shall be applied to the value of any dividends Riiser received on those MLP Units since the time of its breach on March 31, 2021.

Because the Court is unaware of how Riiser will elect to pay the $3,375,000, it cannot yet calculate the amount of prejudgment interest, nor is the amount of prejudgment interest readily ascertainable from the record. The Court therefore cannot at this juncture issue a judgment in this case. *See Pace Commc'ns, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 590–91 (7th Cir. 1994) (noting that "where a court intends to award *pre* judgment interest, its judgment is not final . . . until the amount of interest is calculated"); *Student Loan Mktg. Ass'n v. Lipman*, 45 F.3d 173, 175 (7th Cir. 1995) (noting that a district court judgment imposing prejudgment interest without calculating the amount may be considered final where "the uncalculated interest is free from dispute and is readily ascertainable from the record"). The Court will therefore require that the parties confer and develop a calculation of the amount of prejudgment interest that should be awarded in this case, and file a joint notice advising the Court as to that amount **within thirty (30) days** of the date of this Order.

Finally, GPM argues it is entitled to attorneys' fees and costs incurred in prosecuting this action under Section 14.9 of APA. ECF No. 37 at 8 n.4. Section 14.9 entitles the prevailing party in a judicial proceeding between the parties to "recover reasonable costs and expenses including reasonable attorneys' fees and expenses." ECF No. 35-1 at 71. Riiser does not dispute GPM's entitlement to attorneys' fees and costs under this section of the APA. Under Wisconsin law, attorneys' fees are recoverable in limited circumstances, including "where the parties contract for the award of attorney fees." *Est. of Kriefall v. Sizzler USA Franchise, Inc.*, 816 N.W.2d 853, 872 (Wis. 2012); *see also Hunzinger Const. Co. v. Granite Res. Corp.*, 538 N.W.2d 804, 809 (Wis. Ct. App. 1995) (holding that a party is only

"obligat[ed] to pay attorneys' fees . . . [where] the contract provision clearly and unambiguously so provides").

The relevant language of the APA could not be any clearer that the prevailing party in this matter shall be entitled to reasonable costs, attorneys' fees, and expenses. Having granted in large part GPM's motion for summary judgment and denied in large part Riiser's cross-motion for summary judgment, the Court will—pursuant to Section 14.9 of the parties' contract—award GPM costs, including attorneys' fees and expenses, as the prevailing party in this matter.

The Court will issue a judgment when the calculation of prejudgment interest is received, but judgment will not necessarily be delayed to allow for a determination of the amount of costs, attorneys' fees and expenses. *See Exch. Nat'l Bank of Chi. v. Daniels*, 763 F.2d 286, 291–94 (7th Cir. 1985). To the extent the parties wish for the final judgment in this case to reflect a specific amount of costs, attorneys' fees, and expenses, they should confer and develop a calculation of such amount and file a joint notice advising the Court as to that amount **within thirty (30) days** of the date of this Order. If the Court does not receive such a notice within the specified time frame, the final merits judgment will not reflect the amount of costs, attorneys' fees, and expenses, nor will the Court issue an amended merits judgment to reflect that matter. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (stating that "a claim for attorney's fees is not part of the merits of the action . . . [because] [s]uch an award does not remedy the injury giving rise to the action").

**4.     CONCLUSION**

For the reasons stated above, the Court is obliged to grant in part and deny in part GPM's motion for summary judgment, and deny in part and grant in part Riiser's motion for summary judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff GPM Southeast LLC's motion for summary judgment, ECF No. 36, be and the same is hereby **GRANTED in part and DENIED in part** as set forth in this Order;

**IT IS FURTHER ORDERED** that Defendant Riiser Fuels LLC's motion for summary judgment, ECF No. 38, be and the same is hereby **DENIED in part and GRANTED in part** as set forth in this Order;

**IT IS FURTHER ORDERED** that the parties shall, **within thirty (30) days** of the date of this Order, file a joint notice containing the actual calculation of prejudgment interest to be awarded in this case consistent with the Court's rulings herein; and

**IT IS FURTHER ORDERED** that, should the parties wish for the final judgment in this case to reflect a specific amount of costs, attorneys' fees, and expenses, the parties shall, **within thirty (30) days** of the date of this Order, file a joint notice advising the Court as to that amount.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge